UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| GLENFERD YELLOW ROBE, | ) | CIV. 09-5040-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER |
| vs. | ) | GRANTING SUMMARY |
| | ) | JUDGMENT |
| STEVE ALLENDER, individually | ) | |
| and in his official capacity; | ) | |
| CRAIG TIESZEN, individually and | ) | |
| in his official capacity; and | ) | |
| CITY OF RAPID CITY, SOUTH | ) | |
| DAKOTA, | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

Plaintiff Glenferd Yellow Robe filed a verified complaint against the
defendants alleging various work-place claims.  (Docket 1).  The complaint
asserted, in part, Count I, racial discrimination/hostile work environment
under Title VII, 42 U.S.C. § 2000e *et seq.* ("Title VII"); Count II, retaliation
under Title VII; Count III, racial discrimination under SDCL Chap. 20-13; and
Count IV, retaliation under SDCL Chap. 20-13.[1]  Id.  Defendants filed a motion
for summary judgment as to all counts.  (Docket 66).  For the reasons below,
the motion for summary judgment is granted.

_____

[1]Plaintiff does not object to defendants' request for dismissal of Count V,
civil rights violations under 42 U.S.C. § 1983; Count  VI, civil rights violations
under 42 U.S.C. § 1981; Count VII, civil conspiracy; Count VIII, violation of the
Age Discrimination in Employment Act; and Count IX,  intentional infliction of
emotional distress.  (Docket 88, p. 2).  The remainder of this order will focus
only on Counts I, II, III, and IV of plaintiff's verified complaint.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, a movant is entitled to summary judgment if the movant can "show[] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing a genuine issue of material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  Only disputes over facts that might affect the outcome of the case under the governing substantive law will preclude summary judgment.  Id. at 248.  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate.  Id.  However, the moving party is entitled to judgment as a matter of law if the nonmoving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In such a case, "there can be 'no genuine issue as to any material fact,'

2

since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). The court must review "the record in a light most favorable to the nonmoving party and giving the nonmoving party the benefit of all reasonable inferences drawn from the record." Colenburg v. Starcon Intern., Inc., 619 F.3d 986, 992 (8th Cir. 2010) (citing Turner v. Honeywell Fed. Mfg. & Tech., LLC, 336 F.3d 716, 719-20 (8th Cir. 2003) (internal quotation marks omitted). The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

## UNDISPUTED MATERIAL FACTS

The following undisputed material facts are gathered from plaintiff's verified complaint (Docket 1), defendants' statement of undisputed facts (Docket 68), plaintiff's responses to defendants' statement of undisputed facts and supplemental facts in opposition to defendants' motion for summary judgment (Docket 86), and other undisputed and uncontroverted evidence where indicated.

3

## 1.   EMPLOYMENT HISTORY & PROTECTED STATUS

For over twenty years, Mr. Yellow Robe was employed with the Rapid City Police Department ("Police Department") in sworn and non-sworn positions as a patrolman, detective and license compliance officer.  (Docket 68 ¶ 6).  He officially began as a patrolman with the Police Department in February of 1985.  Id. at ¶ 7.  On May 1, 2007, he was terminated from his position as a license compliance officer, effective May 15, 2007.  Id. at ¶¶ 58 and 61.

Mr. Yellow Robe is an enrolled member of the Rosebud Sioux Tribe.  Id. at ¶ 1.  He is a member of a protected group for Title VII purposes.[2]  (Docket 89, p. 4).

## 2.   CLAIM OF DISCRIMINATION WITHIN THE STATUTORY 300-DAY TIME PERIOD

A threshold question is whether Mr. Yellow Robe has identified any act of discrimination which took place within the statutory 300-day time period required by Title VII.  Section 2000e-5(e)(1) of Title VII provides:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . ., except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State . . . agency with authority to grant or seek relief from such practice . . ., such charge shall be filed . . . within three hundred days after the alleged unlawful employment practice occurred . . . .

42 U.S.C. § 2000e-5(e)(1).

---

[2]Plaintiff stated he "is not a member of a protected group for Title VII purposes."  (Docket 88, p. 5).  The court believes this was a typographical error as Mr. Yellow Robe, a Native American, is entitled to protected group status.

4

On November 27, 2007, Mr. Yellow Robe filed a charge of discrimination with the South Dakota Division of Human Rights against the Rapid City Police Department.  (Docket 68 at ¶ 62).  The charge of discrimination was also filed with the United States Equal Employment Opportunity Commission ("EEOC") on January 10, 2008.  Id. at ¶ 67.  The 300-day statutory time period of Section 2000e-5(e)(1), during which an alleged act of discrimination must have occurred, commenced on March 15, 2007.

"The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened.  It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002).  The court's statement of undisputed facts, or facts and inferences considered in the light most favorable to Mr. Yellow Robe, will focus primarily on those facts relevant to this 300-day time period.

Mr. Yellow Robe asserts three acts of racial discrimination took place within the statutory 300-day time period required by Title VII, 42 U.S.C. § 2000e-5(e)(1).  Those acts are claimed to be:

1.  During the time period of March 15, 2007, to May 15, 2007, during the daily briefing sessions, Mr. Yellow Robe was subjected to demeaning and derogatory comments about Native Americans;

2.      Sergeant Fox's April 21, 2007, e-mail regarding Jerry Moore, a
        Native American officer, and a layperson's interaction with Native
        Americans; and

3.      Officer Allender's violation of Mr. Yellow Robe's privacy by going
        into his desk and erasing evidence of a racially based joke which
        Mr. Allender is alleged to have told in the 1990s.

(Docket 88 at pp. 10-11).

During the time period of March 15, 2007, to May 15, 2007, Mr. Yellow

Robe attended daily morning briefings with the Police Department detectives.

(Docket 86, p. 14 ¶ 27).  During these briefings, supervisors or other officers

commonly made "fun of or criticized Indian names, the way Indians talked,

speculated that Indians drank away their welfare checks, and complained

about drunk Indians [being] present [on] the sidewalks and [in Rapid City's]

parks . . . ."  Id. at ¶ 26.  "[D]etectives [would] complain[] about having to deal

with the same dirty, drunken Indians over and over."  Id. at ¶ 27.  They also

"complained about how judges in Rapid City were too lenient on Native

Americans."  Id.  Throughout his employment with the Police Department, Mr.

Yellow Robe heard Police Department personnel describing Native Americans in

Rapid City as "dirty-ass winos" and officers asking "why [were] they ever let off

the reservation?"  Id. at ¶ 23.

On April 21, 2007, Police Sergeant Fox e-mailed a shift summary to the

daily shift group of the Police Department.  Id. at p. 16 ¶ 41.  This summary

was sent to all police officers, including Mr. Yellow Robe.  Id.  Part of the e-mail

6

regarding a citizen call about a dead bird contained the following comment

about Officer Jerry Moore, a Native American:

> Other: Due to some staffing shortages, I held over two day-shift
> people, one of whom was Jerry (Medicine Man) Moore.  Maybe he,
> along with some of his eagle friends could help us out here.  I brought
> the bird to Jerry, who gave him a good once over, looked me in the
> eye and said "sorry kemosabe, the bird's dead."

Id. at pp. 16-17, ¶ 41.  Sergeant Fox's e-mail concluded with the following

statement:

> While Officer Regan was dealing with some [sic] our drunken street
> people at Prairie Market, a middle aged gentleman who looked like a
> priest or minister pulled up in a Cadillac, walked over to a couple of
> the drunks introduced himself in Lakota and started crying.  He took
> out some tissues, wiped his eyes and then began sobbing.  I couldn't
> take it anymore; I drove away as fast as I could.

Id.

Sometime between January and May of 2007, Officer Allender found an

envelope with an audio tape in Mr. Yellow Robe's desk.  Id. at p. 16, ¶ 39.  The

envelope was labeled "Bad Indian joke told by Allender."   Id.  Mr. Allender used

an electric tape eraser to erase the recording.  Id.  He erased the tape because

he believed it contained a racist joke he told in the 1990s.  Id. at ¶ 40.

Mr. Yellow Robe complained to Chief of Police Tom Hennies in the 1990s

about racially inappropriate comments within the Police Department.  (Docket

86 at p. 13 ¶ 22).  Sometime between 2002 and 2004, Mr. Yellow Robe

complained to Lieutenant Louie Lange, Mr. Yellow Robe's brother-in-law and a

Native American, that Mr. Yellow Robe was being subjected to a racially hostile

7

work environment.  Id. at p. 4 ¶ 28.  Lieutenant Lange was told by Mr. Yellow

Robe he was "sick of the racial antics that go on in the morning . . . briefings

. . . ."  Id.  Mr. Yellow Robe reminded Lieutenant Lange it was his responsibility

to put a stop to such activity.  Id.

 While never complaining directly to Chief of Police Tieszen, Mr. Yellow

Robe did not know who to complain to because several of the Police

Department supervisors who attended the morning briefings "were part of the

problem, too."  (Docket 86 p. 14 ¶ 25).  At no time during his employment with

the Police Department did Mr. Yellow Robe ever go to an officer of authority and

suggest he had been a victim of racial harassment.  (Docket 90-1 at p. 110:8-

13).[3]

 In evaluating whether there was unwelcome racial harassment in the

Police Department, the court must also look at the conduct of Mr. Yellow Robe.

He acknowledged using the "n" word as a Rapid City Police Officer.  (Docket 90-

1 at p. 21:6).  Mr. Yellow Robe called a police detective, who was Jewish,

"hymie" once in a while.  (Docket 72-1 at p. 226:5-14).  He also laughed at

Jewish jokes.  (Docket 90-1 at p. 21:14).

 On at least one occasion Mr. Yellow Robe made a sexual comment about

his wife, Geraldine Yellow Robe, and a particular color of lipstick.  (Docket 90-1

---

[3]Where docket entries consist of a deposition transcript, the court will
reference the specific page(s) and line(s) of the transcript and not the docket
page number.

8

at p. 66:19-67:4).  Mr. Yellow Robe referred to his wife in a sexually offensive way when talking to another police detective.  (Docket 90-1 at p. 67:5-9).

Mr. Yellow Robe, an Oglala Lakota, and his brother-in-law, Lieutenant Louie Lange, a Rosebud Lakota, would share jokes back and forth.  (Docket 72-1 at p. 55:21-56:4).  In the squad room, Mr. Yellow Robe would joke with his brother-in-law "that the Oglala [Native Americans] use clear plastic trash bags so they could see what they were having for lunch . . . ."  Id.

While the compliance officer, Mr. Yellow Robe shared a story in the Police Department involving an old west movie where Native Americans were "killing . . . a white cowboy."  (Docket 72-1 at p. 76:17-77:1).  Mr. Yellow Robe mocked the speech patterns of other Native Americans.  (Docket 87-19 at p. 93:21-94:14).  While helping Officer Allender learn words in the Lakota language, the two of them discovered if they turned up the speed of the microcassette recorder, it would sound like Mickey Mouse.  (Docket 87-19 at p. 94:19-95:9).  When Mr. Yellow Robe and other police officers were together Mr. Allender would bring this tape out and play it in a humorous fashion.  Id. at p. 95:10-222.

Mr. Allender described a "golden boys" invitation which he said Mr. Yellow Robe prepared or participated in preparing.  (Docket 87-19 at p. 115:9-23).  Mr. Yellow Robe would refer to Mr. Allender and other white officers as the

9

"golden boys."  Id. at p. 116:5-7.  The invitation included the following language:

> If you feel you're "man" enough come join us at the downtown Hardee's for fun, frolics and possible romance.  Just remember to ask for the
>
> GOLDEN BOYS
>
> Discretion is our way!  You'll have a golden time
>
> Only whites need apply!!

(Docket 87-4 at p. 1).  Coffee break time at Hardee's restaurant involved white officers, Mr. Yellow Robe and possibly another Native American police officer.  (Docket 87-19 at pp. 116:20-117:4).

### 3.   MR. YELLOW ROBE'S EMPLOYMENT AS COMPLIANCE OFFICER AND HIS TERMINATION

Mr. Yellow Robe became the license compliance officer for the Rapid City Police Department in 2003.[4]  (Docket 89 at p. 13 ¶ 22.  The duties of a license compliance officer include, but are not limited to, conducting complete background investigations on all individuals seeking any type of license from the City of Rapid City ("City").  (Docket 68 ¶ 22).[5]  Beginning in 2004 or 2005, Mr. Yellow Robe began organizing and implementing sting operations to make certain the on-sale and off-sale establishments were complying with the law.

---

[4]Plaintiff's own evidence suggests Mr. Yellow Robe was the compliance officer for the Police Department as early as 2000.  (Docket 87-15).  This difference is not material to the analysis.

[5]Modified to conform to plaintiff's objection in Docket 86 at p. 3 ¶ 22.

(Docket 86 at p. 3 ¶ 23).  These sting operations are commonly referred to as liquor compliance checks.  Id. at ¶ 22.  A compliance check constitutes sending underage individuals, who are not legally able to purchase alcohol and who are without any identification confirming they are of legal age, into a liquor licensee's business to attempt to purchase liquor.  Id. at p. 20 ¶ 61.  "[The] [c]ompliance officer is really responsible for . . . who gets checked, when they get checked, who does the checking, how it's done . . . all aspects of the compliance check are under the direct responsibility of the compliance officer."  (Docket 87-20 at p. 99:7-14).  Mr. Yellow Robe's suggestions for compliance checks were routinely accepted by his supervisors.  Id. at p. 107:9-13.  The Police Department learned that when a compliance sting commenced the first couple of businesses which were being checked would send out word to other liquor businesses that a sting was underway.  Id. at p. 109:21-110:5.

As license compliance officer, Mr. Yellow Robe was responsible for managing and overseeing the Police Department's "bar files."  (Docket 86 at p. 18 ¶ 55).  A bar file is maintained by the Police Department on every liquor business in the City.  Id. at ¶ 54.  All liquor licensees are subject to compliance checks, not just those businesses with reports, complaints or violations involving underage purchasing.  Id. at p. 20 ¶ 60.

Each licensee's bar file contains police contact reports with the establishment, and the file is reviewed at the time of license renewal or

11

transfer.  Id. at p. 19 ¶ 54.  During Mr. Yellow Robe's tenure as license compliance officer, most of the information placed into the bar files was completed by other Police Department personnel, not Mr. Yellow Robe.  Id. at ¶ 56.  As license compliance officer, Mr. Yellow Robe had the responsibility for entering and removing information from the bar files.  (Docket 87-29 at p. 84:25-85:1).

The license compliance officer position was ministerial and non-discretionary.  (Docket 86, p. 17 ¶ 45).  All recommendations made by Mr. Yellow Robe in the course of his duties were conveyed to Police Department supervisors, the Chief of Police or the City Council.  Id.

In 2003, while Mr. Yellow Robe was the license compliance officer, Geraldine applied for a security license to work as a security officer at the City airport.  (Docket 68, ¶ 31).  Security officers are required to obtain an individual security license through the Police Department.  Id. at ¶ 32.  At the time Geraldine applied for her security license neither she nor Mr. Yellow Robe owned the business which had the security contract at the airport.  (Docket 68, ¶33).  Mr. Yellow Robe understood Geraldine's security license application created a conflict for him.  Id. at ¶ 34.  A condition imposed by the Police Department to avoid this conflict was for Mr. Yellow Robe to refrain from any part of the security business.  Id.  He agreed to this condition.  Id.  Mr. Yellow Robe was asked to sign a conflict of interest statement in which he would

12

promise to refrain from any participation in the security business.  Id. at ¶ 35.
At his wife's behest, Mr. Yellow Robe refused to sign the statement.  Id.

Later Geraldine purchased the security business, while Mr. Yellow Robe
remained as the license compliance officer.  (Docket 86, p. 5 ¶ 33).  Geraldine's
application for a security guard license and later ownership of a security
business at the airport were not a conflict with Mr. Yellow Robe's license
compliance officer position as another Police Department employee handled her
background check.  Id. at p. 18 ¶ 53.  Mr. Yellow Robe had no oversight
responsibility for Geraldine's license or security business.  Id.

On August 1, 2005, Mr. Yellow Robe received a commendation from Chief
of Police Tieszen congratulating him on twenty years of service.  (Docket 68,
¶ 37).  Chief of Police Tieszen also expressed his hope that Mr. Yellow Robe's
service with the Police Department would continue "for many years to come."
Id.

Sometime in early 2006, Mr. Yellow Robe advised Captain Hofkamp that
Geraldine was looking into buying a business which may ultimately result in
an application for a liquor license.  (Docket 68 at ¶ 38).  A few days later,
Captain Hofkamp told Mr. Yellow Robe that he had met with Chief of Police
Tieszen and the Chief requested Mr. Yellow Robe keep Captain Hofkamp
informed about the project as it moved forward.  Id. at ¶ 39.

Mr. Yellow Robe was involved in obtaining financing for the purchase of the liquor store.  Id. at ¶ 49.  He was the only applicant for financing as Geraldine was not employed at the time.  Id.  Mr. Yellow Robe was also a signatory with Geraldine on the liquor store purchase agreement in March of 2006.  Id. at ¶ 50.  Mr. Yellow Robe was a guarantor and personally obligated on the debt for the business.  Id. at ¶ 51.  The personal money invested into the business was obtained by refinancing the Yellow Robe family home.  Id.  Mr. Yellow Robe did not inform Captain Hofkamp or anyone else in the Police Department that he was personally obligated on the debt for the liquor store.  Id. at ¶ 52.

On February 27, 2007, Yellow Robe Enterprises, LLC, d/b/a Dacotah Liquors, applied for a liquor license naming Geraldine and Mr. Yellow Robe as the corporate officers.  Id. at ¶ 40; see also Docket 72-4.  On March 12, 2007, Chief of Police Tieszen sent Mr. Yellow Robe a letter advising him a conflict of interest existed if Yellow Robe Enterprises, LLC, held a liquor license at the same time Mr. Yellow Robe was a license compliance officer with the Police Department.  Id. at ¶ 42; see also Docket 72-5.  The memorandum stated:

SUBJECT:   Conflict of Interest

After consulting with the City Attorney we have determined that holding the position of Compliance Officer presents a conflict of interest for you or your spouse to possess an alcoholic beverage license.  Therefore, you can not [sic] be permitted to hold both at the same time.

14

> We will hold your license application until you determine how you
> wish to proceed.  Please contact your commander if you have any
> questions.

(Docket 72-5).  Mr. Yellow Robe understood the letter was sent due to a conflict

of interest and not because of his Native American race.  (Docket 68 at ¶ 43).

Mr. Yellow Robe did not have any reason to believe the memo was issued by

Chief of Police Tieszen because of Mr. Yellow Robe's status as a Native

American.  (Docket 72-1 at p. 133:16-20).  Mr. Yellow Robe recognized the

potential conflict, made the decision to have his wife remove him as president

of the company, and the initial application for the liquor license was withdrawn

or held in abeyance.  (Docket 68 at ¶ 44).

On April 2, 2007, Captain Hofkamp sent an e-mail to Mr. Yellow Robe

reiterating that Geraldine could hold a liquor license, however, doing so would

create a conflict of interest with his position as the license compliance officer.

Id. at ¶ 46; see also Docket 72-7.  The e-mail stated:

> I received your memo outlining your concerns this morning.  Please
> come see me as Geraldine may submit her license application.  The
> letter did not indicate she could not hold a license but instead
> indicated a conflict of interest for you or your spouse to possess an
> alcoholic beverage license with your current position as Compliance
> Officer.  Therefore, you cannot be permitted to hold both at the same
> time.
>
> I agree with Geraldine and believe the license will be approved but it
> is up to you as how you will decide to proceed.  If you recall, you did
> not act on the first request and we are awaiting the second
> application.  We are not holding the license and have yet to receive a
> second application.

(Docket 72-7).  In the second application, Mr. Yellow Robe's name was removed and Geraldine was identified as the only officer of the company.  (Docket 72-6). That same day the Rapid City Common Council approved the application for an off-sale liquor license for Yellow Robe Enterprises, LLC.  (Docket 68 at ¶ 47).

As one of Mr. Yellow Robe's immediate supervisors, Officer Allender was concerned about the conflict of interest issue.

> Appears to me to be a conflict because Glen would control to a great extent the frequency of compliance checks on either his own business and the competition.  He would select which businesses would be checked on which dates, and would be in a position to give recommendations on offenses committed by the competition as to what type of action might be taken or how serious something should be looked at as well as his own business . . . .

> Liquor stings, the oversight of the competition, [Mr. Yellow Robe's] position to conduct the liquor stings and influence the frequency of the stings.  And then over and above all those things, the perception that the competing liquor stores might and probably should have that the guy in position to maintain compliance and fairness is in fact one of their competitors.

(Docket 87-19 at pp. 81:9-18 & 83:4-11).

On April 11, 2007, Mr. Yellow Robe received a memorandum from Chief of Police Tieszen addressing the conflict of interest.  Id. at ¶ 48; see also Docket 72-8.  The memorandum stated:

> On April 2, 2007, the Rapid City Council approved an alcoholic beverage license for your wife, Geraldine, doing business as Dacotah Liquors.

> As we previously advised you, this constitutes an unacceptable conflict of interest with your position as compliance officer.

16

Therefore, you must immediately be removed from all your licensing and compliance responsibilities relating to alcoholic beverages.  As you well know, those responsibilities are a primary component of the compliance officer job description and I see no alternative that will allow you to keep that position.

Therefore, I need to know, by April 18th, your intentions regarding your employment status.

(Docket 72-8).  Mr. Yellow Robe did not respond.

Chief of Police Tieszen was concerned Mr. Yellow Robe could recruit young people for the sting operations on Geraldine's liquor store who were obviously underage so no illegal sale would occur.  (Docket 87-20 at pp. 120:16-121:3).  A competing business could object to this type of sting because it was so different from the sting which caught the competing business.  Id.  at p. 121:7-13).  Another conflict of interest arose because Mr. Yellow Robe had the responsibility of entering and removing information from the bar files, including "his wife's business file as well as the files of other competing businesses. . . . that's a conflict."  Id. at p. 84:25-85:10.  Geraldine may have a competitive advantage over other licensees because "some businessmen, especially liquor businesses, . . . don't appreciate interacting with the police on a regular basis."  Id. at p. 21 ¶ 65.

Jim Shaw served as the City's Mayor from 1997 to 2001 and again from 2003 to 2007.  Id. at p. 12 ¶ 13.  During his tenure, Mayor Shaw initiated an informal community effort entitled the "Undoing Racism Task Force."  Id. at ¶ 14.  The Undoing Racism Task Force met once a month.  Id. at p. 13 ¶ 15.

17

Officer Tieszen, who became Chief of Police on June 2, 2000, was a member of the task force.  Id.  The Undoing Racism Task Force heard concerns about how the Police Department was "unduly harsh with Native peoples[.]"  Id. at ¶ 17.

In early 2007, Chief of Police Tieszen announced his upcoming retirement.  (Docket 68 ¶ 53).  On April 12, 2007, at the suggestion of City Councilman Tom Johnson, Mr. Yellow Robe e-mailed Mayor Shaw requesting a meeting to discuss Mr. Yellow Robe's views about Officer Allender being Chief Tieszen's replacement.  (Docket 86 at p. 22 ¶ 77).  The subject line of the e-mail was "Chief of Police Candidates."  Id.  In Mr. Yellow Robe's e-mail, which he copied to Councilman Johnson and another city council member, Mr. Yellow Robe stated "there were some serious issues that I have as an American Indian man and co-worker of Captain Steve Allender."  Id. at ¶ 78.  That same day Mayor Shaw e-mailed Mr. Yellow Robe indicating he would like to meet about this "important matter."  Id. at p. 23 ¶ 79.  Mr. Yellow Robe asked that their meeting be kept confidential and Mayor Shaw agreed to meet "privately" with him.  Id. at p. 24 ¶ 86.

During their meeting,[6] Mr. Yellow Robe presented Mayor Shaw with a memorandum expressing his opinions about a number of candidates for Chief of Police.  (Docket 86 at p. 23, ¶ 80).  In this memo, Mr. Yellow Robe wrote:

---

[6]The meeting between Mr. Yellow Robe and Mayor Shaw occurred sometime prior to Mr. Yellow Robe's termination on May 15, 2007.  (Docket 68 ¶ 56).

> Captain Steve Allender:  Racial Issues/discrimination issues/sexual discrimination issues involving women in the Criminal Investigations Division . . . I find his involvement in the Undoing Racism Task Committee a joke.  I truly believe the Indian people of Rapid City would not accept him as the next Chief of Police . . . .

Id. at ¶ 81.  At the meeting, Mr. Yellow Robe also presented Mayor Shaw with "cartoons, drawings, pictures . . . that either purported . . . having an image of Mr. Allender or someone else in the police department on them . . . ." Id. at ¶ 82.  These were all racially or sexually inappropriate materials.  (Docket 87-21 at p. 76:10-19.

Despite the meeting with Mr. Yellow Robe and his expressed concerns, Mayor Shaw believed Officer Allender was a "clear top choice" to become Chief of Police.  (Docket 86 at p. 23 ¶ 84).  Mayor Shaw thought it was "inappropriate" and "unusual" for someone in Mr. Yellow Robe's position with the Police Department to provide input regarding the applicants applying for the position of Chief of Police.  Id. at ¶ 83.  Mayor Shaw believed Mr. Yellow Robe "politicized" his concerns about Officer Allender by including Councilman Johnson in the e-mail requesting the meeting.  Id. at pp. 23-24 ¶ 85.  The Mayor told City Attorney Jason Green about the meeting right after the Yellow Robe meeting took place.  Id. at p. 24 ¶ 86.

Chief of Police Tieszen consulted with City Attorney Jason Green regarding the issue of Mr. Yellow Robe's position as license compliance officer and Geraldine's holding of a City liquor license.  Id. at p. 21 ¶ 66.  On May 1,

2007, Chief of Police Tieszen sent a letter to Mr. Yellow Robe notifying him of

his termination as a license compliance officer effective May 15, 2007.  (Docket

68 ¶ 58; <u>see also</u> Docket 72-9).  The letter read:

> As you have been notified and we have discussed, I have been
> advised by City Attorney Jason Green that the liquor license issued
> to your wife, Geraldine Yellow Robe, on April 16, 2007, constitutes an
> unacceptable conflict of interest with you and your position as
> compliance officer with the Rapid City Police Department.  Since that
> time Mr. Green has reviewed your attorney's (Mr. Pechota) position on
> this issue and has carefully reevaluated the court decision triggering
> his position.  Based on that review he still strongly believes that a
> conflict of interest exists.
>
> Based on the fact that alcoholic beverage licensing and compliance
> are major duties of the compliance officer I feel I have no option other
> than to terminate your employment with the Rapid City Police
> Department.  Glen, I am truly dismayed that we have arrived at this
> crossroads; however you were notified of our concerns prior to the
> issuance of the license.  It seems now that no other option exists.
> I sense that this action will trigger some sort of legal confrontation.
> I wish that could be avoided but realistically it appears necessary to
> resolve the disagreement.
>
> Therefore, I propose to terminate your employment as compliance
> officer with the Rapid City Police Department effective May 15, 2007.
> You may appeal this decision under the terms of the Union Contract.

(Docket 72-9).

The same day Mr. Yellow Robe received his termination letter, May 1,

2007, he sent an e-mail captioned "Asta Lavista" to the members of the Police

Department. (Docket 69-10).  In the e-mail, he reported his pending

termination and then declared:

> I want everyone to know that I intend to have my attorney look into
> this matter and will oppose [Chief Tieszen's] decision.  It's been a fun

> 22 1/2 years I have had with the city and enjoyed working with all of you. . . . I don't know how this legal issue will turn out but I would like to invite all of you to stop by and see me at Dacotah Liquors located at 418 Knollwood Dr.  I'll have all of your party needs.

Id.  His printed signature appeared at the end of the e-mail as "Glen Yellow Robe, License Compliance Investigator, Rapid City Police Department, Criminal Investigations Division . . . ."  Id.  Mr. Yellow Robe was terminated on May 15, 2007.  (Docket 68 at ¶ 61).

Officer Allender became aware of the negative recommendation given to Mayor Shaw by Mr. Yellow Robe when a Police Department information technology worker found the memorandum on Mr. Yellow Robe's computer after his termination.  (Docket 87-19 at pp. 73:7-74:4-21).  Officer Allender discussed Mr. Yellow Robe's negative recommendation with Chief of Police Tieszen before Mayor Shaw left office.[7]  Id. at pp. 72:20-73:4.  Mr. Allender was appointed Chief of Police in August of 2007.  (Docket at 87-19 at p. 74:5-6).

Mr. Yellow Robe claims he was retaliated against because of his meeting with Mayor Shaw regarding Mr. Allender's fitness to be the next Chief of Police. (Docket 86 at p. 25, ¶ 93).  However, Mr. Yellow Robe testified there was no relationship between Chief of Police Tieszen's termination decision and Mr. Yellow Robe's efforts to undermine Mr. Allender's promotion to Chief of Police. (Docket 72-1 at p. 145:19-24).

---

[7]Alan Hanks took office as the Mayor of Rapid City on July 3, 2007. (Docket 87-24 at p. 43:12).

Mr. Yellow Robe asserts the City's decision to terminate his employment based on conflict of interest was pretextual.  (Docket 88, p. 17).  Plaintiff's assertion of facts which he claims support his pretext claim are as follows.[8]

For a number of years while Nelva Blenner was a sworn officer with the Police Department, but not a license compliance officer, her husband owned the Hall Inn and held a City liquor license.  (Docket 68 at ¶73).  Officer Blenner was a corporate officer in H & B, Inc., d/b/a the Hall Inn.  (Docket 86 at p. 8 ¶ 73).  During this same time frame, Officer Blenner regularly patrolled other bars in the City, made arrests and issued citations to license holders.  Id.  Officer Blenner's tenure as a patrol officer and corporate officer in H & B, Inc., coincided with Mr. Tieszen's tenure as Chief of Police.[9]  Id. at p. 9 ¶ 75.

Chief of Police Tieszen had hiring and termination authority over Police Department employees who, in his opinion, had conflicts of interest.  Id.  What constitutes an "unacceptable conflict of interest" was "ultimately" a determination by Chief of Police Tieszen.  Id. at ¶ 77.  There were no guidelines, rules or ordinances that defined what constitutes a conflict of interest for a Police Department employee.  (Docket 86 at p. 19 ¶ 58).

---

[8]Again, the facts and inferences from those facts must be viewed in the light most favorable to Mr. Yellow Robe, the nonmoving party.  Matsushita, 475 U.S. at 587-88.  The court must review "the record in a light most favorable to the nonmoving party and giving the nonmoving party the benefit of all reasonable inferences drawn from the record."  Colenburg, 619 F.3d at 992.

[9]Officer Blenner is the only comparably situated employee known to Mr. Yellow Robe.  (Docket 68 at ¶ 76).

22

Mr. Yellow Robe believed the Police Department would remove him from conducting liquor stings, as he had volunteered to perform those activities, and stings were not part of the license compliance officer's job description. (Docket 86 at p. 18, ¶48). He assumed the Police Department would handle the background check on Geraldine for her City liquor license in the same manner the department handled her security license at the airport. Id. at p. 19 ¶ 52. Chief of Police Tieszen testified it would have been possible for the Police Department to create a system whereby all matters concerning Geraldine's bar file could be handled by another employee within the department. (Docket 86 at p. 18 ¶ 57). Chief of Police Tieszen testified Geraldine would have a competitive advantage over other City liquor licensees if those competitors were subject to more frequent compliance checks than Geraldine's business, as "the frequency with which [a licensee] get[s] checked would have some influence on the number of violations that [a licensee] might have." (Docket 86 at p. 20 ¶ 62). During Mr. Tieszen's tenure as Chief of Police, Mr. Yellow Robe was the only employee terminated for having a conflict of interest. Id. at p. 22 ¶ 75.

Mr. Yellow Robe believes he would have retained his position as license compliance officer had he not blown the whistle on Officer Allender's activities and proclivities. Id. at pp. 25-26 ¶ 97. Mr. Yellow Robe testified that Mayor Shaw, Chief of Police Tieszen and Officer Allender conspired to orchestrate a reason to terminate him because of his actions with the Mayor. (Docket 68 at ¶ 83).

23

**ANALYSIS**

Section 1981 of Title VII provides:

(a) Statement of equal rights.  All persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined.  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment.  The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

Plaintiff's claims can be focused for discussion purposes as follows:

1.   Racially hostile work environment claims under Title VII (Count I) and SDCL Chap. 20-13 (Count III);

2.   Employment discrimination claims under Title VII (Count I) and SDCL Chap. 20-13 (Count III); and

3.   Retaliatory Termination claims under Title VII (Count II) and SDCL Chap. 20-13 (Count IV).

(Docket 88, p. 3).

Mr. Yellow Robe concedes defendants Steve Allender and Craig Tieszen, as police officers with the Police Department, are not "employers" as defined under Title VII and cannot be individually liable for their conduct toward

24

plaintiff.  (Docket 88, p. 3).  Under Title VII, any liability for the conduct of Mr. Allender or Mr. Tiezsen is charged against the City.  <u>Bales v. Wal-Mart Stores, Inc.</u>, 143 F.3d 1103, 1111 (8th Cir. 1998).  "[S]tatutory liability [under Title VII] is appropriately borne by employers, not individual supervisors."  <u>Id.</u> (internal citation omitted).  "[W]hile a supervisory employee may be joined as a party defendant in a Title VII action, that employee must be viewed as being sued in his capacity as the agent of the employer, *who is alone liable for a violation of Title VII.*"  <u>Id.</u>  (internal citation omitted) (emphasis in original).  Accordingly, claims against Mr. Allender and Mr. Tiezsen in their individual capacities are dismissed.

### 1.   RACIALLY HOSTILE WORK ENVIRONMENT

Claims of racial harassment and the existence of a hostile work environment are frequently alleged together to focus on a single employment environment.  To make a racially hostile work environment claim under Title VII, Mr. Yellow Robe must prove four elements, summarized as follows:

1. That he is a member of a protected group;

2. That there is unwelcome harassment;

3. That there exists a causal nexus between the harassment and his membership in the protected group; and

4. That the harassment affected a term, condition, or privilege of employment.

Watson v. CEVA Logistics U.S., Inc., 619 F.3d 936, 942 (8th Cir. 2010). "To the extent non-supervisory employees are responsible for the harassment, the plaintiff must also show that the employer knew or should have known about the harassment but failed to take proper action." Id. (internal citation and quotation marks omitted). "Harassment which is severe or pervasive is deemed to affect a term, condition, or privilege of employment." Id. (internal citation and quotation marks omitted). "The standard is a demanding one, and '[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious)' will not suffice." Id. (citing Arraleh v. County of Ramsey, 461 F.3d 967, 979 (8th Cir. 2006)). The standard acknowledges an infrequent or inappropriate comment is not enough.

> Mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to support a claim of hostile work environment. To sustain a claim, the workplace must be permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Further, the hostile work environment must be both objectively and subjectively abusive.

Id. (internal citations and quotation marked omitted). There must be "a clear pattern of offensive conversation and behavior, *not merely an isolated incident or two.*" Gardner v. Tripp County, S.D., 66 F. Supp. 2d 1094, 1099 (D.S.D. 1998) (citing Bales, 143 F.3d at 1106-07 (emphasis in original). "To be actionable, such conduct must be shown to occur with such frequency that the very conditions of employment are altered and be viewed by a reasonable

26

person as hostile." <u>Singletary v. Missouri Department of Corrections</u>, 423 F.3d 886, 893 (8th Cir. 2005). "In order for harassment to be severe enough to affect a condition of employment, the conduct must be severe as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim." <u>Ross v. Douglas County, Nebraska</u>, 234 F.3d 391, 396 (8th Cir. 2000).

"To determine whether racial harassment . . . is sufficiently severe or pervasive to be actionable, [the court] must consider all of the circumstances, including the frequency and severity of the discriminatory conduct; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Helton v. Southland Racing Corp.</u>, 600 F.3d 954, 959 (8th Cir. 2010) (internal citation and quotation marked omitted). To the extent other employees within the Police Department who were not supervisory personnel are responsible for the unwelcome harassment, Mr. Yellow Robe "must also show that the employer knew or should have known about the harassment but failed to take proper action." <u>Watson</u>, 619 F.3d at 942 (internal citation and quotation marks omitted).

Under Title VII, Mr. Yellow Robe, a Native American, is a member of a protected group. That satisfies the first prong of the required elements for

these claims.  <u>Watson</u>, 619 F.3d at 942.   Mr. Yellow Robe cannot satisfy the second prong for a Title VII claim that "there is unwelcome harassment."  <u>Id.</u>

By Mr. Yellow Robe's own admission, for years he was involved in racial antics in the Police Department.  From Jewish jokes and use of the "n" word to telling racially off-color jokes about Native American people, Mr. Yellow Robe actively participated in what the court can only describe as inappropriate behavior and comments by Rapid City Police Department personnel.  Mr. Yellow Robe does not claim the alleged hostile work environment and racial harassment resulted in any adverse employment action.  Mr. Yellow Robe fully expected and desired to remain an officer with the Police Department.  He fails to show how "the harassment affected a term, condition, or privilege of employment."  <u>Watson</u> 619 F.3d at 942.  Mr. Yellow Robe's claims of a racially hostile work environment fail.

### 2.    EMPLOYMENT DISCRIMINATION

Employment discrimination based on race is a separate and distinct cause of action.  For Mr. Yellow Robe "[t]o establish a prima facie case of race discrimination, [he] must show that [he]: (1) is a member of a protected class; (2) was meeting [his] employer's legitimate job expectations; (3) suffered an adverse employment action; and (4) was treated differently than similarly–situated employees who were not members of [his] protected class."  <u>Norman v. Union Pacific R.R. Co.</u>, 606 F.3d 455, 461 (8th Cir. 2010).

28

To survive defendants' motion for summary judgment, Mr. Yellow Robe has two avenues available to him.  "The first is by proof of 'direct evidence' of discrimination."  Torgerson v. City of Rochester, 643 F.3d 1031, 1044 (8th Cir. 2011 (*en banc*) (citing Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004)).  "[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged [conduct], sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  Id. (citing Griffith, 387 F.3d at 736) (additional internal citation and quotation marks omitted). " '[D]irect' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence."  Id. (citing Griffith, 387 F.3d at 736).  "[I]f the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the McDonnell Douglas[10] analysis, including sufficient evidence of pretext."  Id. (citing Griffith, 387 F.3d at 736).

Under the burden-shifting framework of McDonnell Douglas, "a Title VII plaintiff has the initial burden of establishing a prima facie case of race discrimination."  Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1107 (8th Cir. 1998).  If Mr. Yellow Robe "is successful in establishing a prima facie case, a rebuttable presumption of discrimination arises."  Id.  "The burden then

---

[10]McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).

shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for the adverse employment action." Id.  The employer's "burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 853 (8th Cir. 2005) (internal citation and quotation marks omitted) *abrogated on other grounds by* Torgensen v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011).  "Once the employer articulates such a reason, the presumption of discrimination disappears entirely and the plaintiff bears the burden of proving that the employer's proffered reason is merely a pretext for discriminatory animus." Rose-Maston, 133 F.3d at 1107. "[T]he ultimate burden falls on [Mr. Yellow Robe] to produce evidence sufficient to create a genuine issue of material fact regarding whether [the City's] proffered nondiscriminatory reason is a pretext for discrimination." Rodgers, 417 F.3d at 853.

"There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext." Torgerson, 643 F.3d at 1047 (citing Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006) *abrogated on other grounds by* Torgensen)).  First, "that the employer's explanation is 'unworthy of credence . . . because it has no basis in fact.' " Id. (citing Wallace, 442 F.3d at 1120).  "Alternatively, a plaintiff may show pretext "by persuading the court that a [prohibited] reason more likely motivated the employer." Id.

(citing <u>Wallace</u>, 442 F.3d at 1120).  "Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action."  <u>Id.</u> (citing <u>Wallace</u>, 442 F.3d at 1120).

"Proof of pretext, coupled with a strong prima facie case, may suffice to create a triable question of fact."  <u>Id.</u> at 1046.  "To defeat summary judgment, [Mr. Yellow Robe] must produce sufficient evidence from which a reasonable factfinder could infer discrimination."  <u>Id.</u> at 1050.

"At the prima facie stage of the <u>McDonnel Douglas</u> burden-shifting framework, [the court uses a] low-threshold standard for determining whether employees are similarly situated."  <u>Rodgers</u>, 417 F.3d at 852.  "The burden of establishing a prima facie case of disparate treatment is not onerous."  <u>Id.</u> (citing <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)).  "Under the low-threshold standard, [Mr. Yellow Robe] must show that [he and other police officers were involved in or accused of the same or similar conduct and [were] disciplined in different ways."  <u>Id.</u> (internal citation omitted).  While the severity of the violations of the employer's policies and the frequency of those violations may vary, those "differences are relevant to the issue of whether [Mr. Yellow Robe and the other employees were] similarly situated for purposes of showing pretext."  <u>Id.</u> at 852-53.  Under either test, plaintiff must show he suffered an "adverse employment action."  <u>Norman</u>, 606 F.3d at 460.  Without question, termination is an "adverse employment action." <u>Id.</u>

"[R]acial discrimination claims under Title VII and SDCL 20–13–10 are analyzed under the same framework." Mutua v. Texas Roadhouse Management Corp., 753 F. Supp. 2d 954, 958 (D.S.D. 2010). See also Huck v. McCain Foods, 479 N.W.2d 167, 169 (S.D. 1991) ("[W]e now expressly acknowledge . . . that SDCL 20–13–10 is comparable to the corresponding provision in Title VII . . . .").

Concerning Mr. Yellow Robe's claim, "[a]n employee may establish unlawful employment discrimination through direct or indirect evidence." Takele v. Mayo Clinic, 576 F.3d 834, 838 (8th Cir. 2009) (internal citation omitted). Mr. Yellow Robe presents no direct evidence of discrimination, thus the court applies the McDonnell Douglas framework. Id.

Under the burden shifting framework of McDonnell Douglas, Mr. Yellow Robe "has the initial burden of establishing a prima facie case of race discrimination." Rose-Maston, 133 F.3d at 1107. "To present a prima facie case of discriminatory discharge, [plaintiff] was required to show 'that [he] was a member of a protected class, that [he] was qualified for the position, and that despite [his] qualification [he] was displaced from the position.'" Id. at 1008 (citing Ruby v. Springfield R–12 Public School District, 76 F.3d 909, 911 (8th Cir. 1996). Mr. Yellow Robe's evidence establishes a prima facie case, "thus creating a rebuttable presumption of discrimination." Id.

The burden under <u>McDonnell Douglas</u> then shifts to the City "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." <u>Colenburg</u>, 619 F.3d at 992 (internal citation omitted).  Chief of Police Tieszen expressed a completely reasonable explanation for Mr. Yellow Robe's termination.  For over a year before his termination, Police Department supervisors participated in discussions with Mr. Yellow Robe about the clear conflict of interest between his compliance officer job and the liquor business which was going to be opened under his wife's name.  Mr. Yellow Robe knew a conflict existed and he chose not to tell Captain Hoffman, Officer Allender or Chief of Police Tieszen about his behind-the-scenes participation in the purchase of the liquor business.  Mr. Yellow Robe was the <u>only</u> signator on the financing documents and he used the Yellow Robe family home as collateral.  Reportng this information would have clarified the depth of the conflict between the family's liquor business and Mr. Yellow Robe's position as license compliance officer.

Chief of Police Tieszen's memorandum of March 12, 2007, laid it out clearly to Mr. Yellow Robe.  "[H]olding the position of Compliance Officer presents a conflict of interest for you or your spouse to possess an alcoholic beverage license.  Therefore, you can not [sic] be permitted to hold both at the same time."  (Docket 72-5).  On April 2, 2007, Captain Hofkamp addressed the liquor license-compliance officer conflict again.  "[Y]ou cannot be permitted to

33

hold both at the same time." (Docket 72-7). Then on April 11, 2007, when the Chief of Police sent a memorandum to Mr. Yellow Robe and asked his intentions regarding the conflict of interest and his employment status, Mr. Yellow Robe chose not to respond.

Mr. Yellow Robe does not deny he received the April 11 memorandum, but argues the "unacceptable conflict of interest" Chief of Police Tieszen believed existed was not grounded in any Police Department policy, regulation, city ordinance or state law. (Docket 86 at p. 6 ¶ 48). The Chief of Police is empowered to decide if an "unacceptable conflict of interest" exists when one of the department's officers is in a position of authority over that officer's personal business competitors.

This conflict of interest is not comparable to the earlier airport security business in which Geraldine first worked and later purchased. The security officer license and business approval were a one-time clearance issue, easily conducted by another officer within the Police Department. The significant difference is the airport security business did not have any competitors, while in the liquor business there are numerous competitors in the community. Competitors which are scrutinized on a regular basis for liquor law compliance.

Mr. Yellow Robe's claim he was a volunteer for the liquor sting activities is meaningless. He was paid to perform all the duties of the license compliance officer, not just those select activities he now chooses to separate out and

argue should not be part of his job description.  Chief of Police Tieszen acknowledged the Pennington County Sheriff's Office could have taken over compliance checks of Geraldine's liquor business, but that would not have resolved the conflict.

Chief of Police Tieszen was legitimately concerned that Mr. Yellow Robe not only supervised the liquor compliance stings of Dacotah Liquor competitors, but that he also controlled the bar files.  These files are a critical part of the continued viability of a City-licensed liquor business.  Mr. Yellow Robe as compliance officer could include critical information in each file and could pull information out of a file.  While there is no evidence or suggestion Mr. Yellow Robe handled the bar files inappropriately, the appearance of access, authority and ability to tamper with the bar files was present.  Mr. Yellow Robe's position as license compliance officer created a direct and clear conflict between his family liquor business and the competing liquor businesses in Rapid City.

The department's concern with the developing conflict of interest was well known to Mr. Yellow Robe.  The communications between Mr. Yellow Robe, Captain Hofkamp and Chief of Police Tieszen presented a clear warning that if Geraldine received a City liquor license, Mr. Yellow Robe would be terminated from the Police Department.  Mr. Yellow Robe knew he had a choice.  If his wife received the liquor license, his employment with the Police Department would

35

be terminated.  At no time prior to his termination did Mr. Yellow Robe tell his supervisors he suspected a racial motivation for the adverse personnel action.

The claim of pretext fails.  Mr. Yellow Robe's continued employment was a conflict of interest because of Geraldine's liquor business.  The employer's "burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." Rodgers, 417 F.3d at 853.

"Once the employer articulates such a reason, the presumption of discrimination disappears entirely and the plaintiff bears the burden of proving that the employer's proffered reason is merely a pretext for discriminatory animus."  Rose-Maston, 133 F.3d at 1107.  "[T]he ultimate burden falls on [Mr. Yellow Robe] to produce evidence sufficient to create a genuine issue of material fact regarding whether [the City's] proffered nondiscriminatory reason is a pretext for discrimination."  Rodgers, 417 F.3d at 853.

"There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext."  Torgerson, 643 F.3d at 1047 (internal citation omitted).  First, "that the employer's explanation is 'unworthy of credence . . . because it has no basis in fact.' "  Id. (internal citation omitted). "Alternatively, a plaintiff may show pretext 'by persuading the court that a [prohibited] reason more likely motivated the employer.' "  Id. (internal citation omitted).  "Either route amounts to showing that a prohibited reason, rather

36

than the employer's stated reason, actually motivated the employer's action."
Id. (internal citation omitted).  "Proof of pretext, coupled with a strong prima
facie case, may suffice to create a triable question of fact."  Id. at 1046.  "To
defeat summary judgment, [Mr. Yellow Robe] must produce sufficient evidence
from which a reasonable factfinder could infer discrimination."  Id. at 1050.

The City's explanation for its decision to terminate Mr. Yellow Robe has a
"basis in fact."  Torgerson, 643 F.3d at 1051.  Mr. Yellow Robe's claim that
racial discrimination "more likely motivated the employer" also fails.  Id.
Mr. Yellow Robe's evidence does not support his claim of racial discrimination.
Norman, 606 F.3d 461.

Mr. Yellow Robe attempts to demonstrate pretextual firing by pointing to
Officer Nelva Blenner whose husband was a bar owner.  "At the pretext stage of
the McDonnell Douglas burden-shifting framework, the test for determining
whether employees are similarly situated to a plaintiff is a rigorous one."
Rodgers, 417 F.3d at 853 (emphasis added).  Mr. Yellow Robe must show he
and Officer Blenner were "similarly situated in all relevant respects."  Id.  Mr.
Yellow Robe's claim that Officer Blenner was allowed to remain on the force
after she and her husband purchased the Hall Inn does not meet that rigorous
burden.

While Officer Blenner had arrest authority to keep the peace at all
licensed liquor businesses, she had no authority to establish license

37

compliance sting operations and she did not control the Police Department bar files.  Officer Blenner and Mr. Yellow Robe were not in comparable positions and cannot be reasonably compared for purposes of showing unequal treatment.  Id. at 854

The facts viewed in a light most favorable to Mr. Yellow Robe do not present a triable issue of racial discrimination.  Torgensen, 643 F.3d at 1052 (citing Liberty Lobby, 477 U.S. at 251-52).  "To be material, a fact 'must affect the outcome of the suit under the governing law.' " Id. (citing Liberty Lobby 477 U.S. at 248).  A rational jury could not find racial discrimination or a pretextual motive for Mr. Yellow Robe's termination.  Id. at 1051.

Mr. Yellow Robe cannot satisfy his burden of proof as to his claims of a racially hostile work environment or employment discrimination.  Defendants' motion for summary judgment on Counts I and III is granted.

### 3.    RETALIATORY TERMINATION

Title VII declares "[i]t shall be an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [an employee] has opposed any practice made an unlawful employment practice by this subchapter . . . ."  42 U.S.C. § 2000e-3(a).  "The elements of a retaliation claim under section 1981 are (1) protected activity, (2) subsequent adverse employment action, and (3) a causal relationship between the two."  Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1051 (8th Cir. 2002).  "Title VII

makes it unlawful for an employer to discriminate against an employee for 'oppos[ing] any practice made unlawful by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter.' " <u>Gilooly v. Missouri Department of Health and Senior Services</u>, 421 F.3d 734, 739 (8th Cir. 2005) (citing 42 U.S.C. § 2000e-3(a)).

"Protected activity is an informal or formal complaint about, or other opposition to, an employer's practice or act . . . if the employee reasonably believes such an act to be in violation of the statute in question." <u>Jeseritz v. Potter</u>, 282 F.3d 542, 548 (8th Cir. 2002).

"Title VII prohibits retaliation only when it is motivated by an employee's opposition to discriminatory employment practices . . . ." <u>Bonn v. City of Omaha</u>, 623 F.3d 587, 591 (8th Cir. 2010).  The United States Court of Appeals for the Eighth Circuit instructs that Title VII, § 2000e-3(a), covers "opposition to employment actions that are not unlawful, as long as the employee acted in a good faith, objectively reasonable belief that the practices were unlawful." <u>Id.</u> (internal citation and quotation marks omitted).  The court should "therefore proceed on the assumption that [Mr. Yellow Robe's] activity was protected if [he] acted with such a reasonable belief." <u>Id.</u>

"To defeat summary judgment on a retaliation claim, a plaintiff must produce either direct evidence of retaliation, or create an inference of retaliation

39

under the <u>McDonnell Douglas</u> burden-shifting framework." <u>Pye v. Nu Aire,</u>
<u>Inc.</u>, 641 F.3d 1011, 1020 (8th Cir. 2011) (citing <u>Young–Losee v. Graphic</u>
<u>Packaging Int'l, Inc.</u>, 631 F.3d 909, 912 (8th Cir. 2011) (citation omitted).
"Direct evidence of retaliation is evidence that demonstrates a specific link
between a materially adverse action and the protected conduct, sufficient to
support a finding by a reasonable fact finder that the harmful adverse action
was in retaliation for the protected conduct." <u>Id.</u> (internal citation omitted).  "A
plaintiff must show that the protected conduct was a determinative factor in
the employer's materially adverse employment action." <u>Id.</u>

"To prove a causal connection under the third element, a plaintiff must
prove that an employer's retaliatory motive played a part in the adverse
employment action." <u>Gilooly</u>, 421 F.3d at 739.  "[E]vidence that gives rise to an
inference of a retaliatory motive on the part of the employer is sufficient to
prove a causal connection." <u>Id.</u> at 739-40.  "A plaintiff must show that the
protected conduct was a determinative factor in the employer's materially
adverse employment action." <u>Pye</u>, 641 F.3d at 1020 (internal citation omitted).

The amount of time lapsing between the protected activity and the
alleged adverse employment action is an important consideration.  <u>See Smith v.</u>
<u>St. Louis University</u>, 109 F.3d 1261, 1266 (8th Cir. 1997) ("The passage of time
between events does not by itself foreclose a claim of retaliation; rather, it
weakens the inference of retaliation that arises when a retaliatory act occurs

shortly after a complaint.") (*abrogated on other grounds by* <u>Torgensen</u>).  The "coincidental timing" between the two events can only be "rebutted by legitimate justification" for the adverse employment action.  <u>Id.</u>  Where "the temporal proximity is very close, a plaintiff can rest on it exclusively for purposes of establishing a prima facie case." <u>Pye</u>, 641 F.3d at 1022 (internal citation omitted).

The City "may rebut a plaintiff's claim by advancing a legitimate, non-retaliatory reason for the adverse employment action." <u>Gilooly</u>, 421 F.3d at 739 (internal citation and quotation marks omitted).  "If the defendant can show a legitimate reason, the plaintiff must show that the given reason was only a pretext for discrimination." <u>Id.</u>  "To establish a retaliation claim, a plaintiff need not succeed on the underlying harassment claims." <u>Id.</u>

Retaliation claims under SDCL § 20-13-10 are analyzed under the corresponding provisions of Title VII.  "[T]he court's analysis of the Title VII claim applies similarly to the state-law retaliation claim." <u>Taylor v. United Laboratories, Inc.</u>, Civ. 08-4053, 2010 WL 3081535 (D.S.D. Aug. 6, 2010). Throughout the remainder of the discussion the court will make reference only to Mr. Yellow Robe's Title VII claims because the state law claims require proof of the same elements.

Mr. Yellow Robe claims he was terminated in retaliation for his meeting with Mayor Shaw regarding Officer Allender's fitness to be the next Chief of

Police.  (Docket 86 at p. 25 ¶ 93).  But Mr. Yellow Robe testified there was no relationship between Chief of Police Tieszen's termination decision and Mr. Yellow Robe's efforts to undermine Mr. Allender's promotion to Chief of Police. (Docket 72-1 at p. 145:19-24).

"[A] party cannot avoid summary judgment by contradicting his own earlier testimony."  Prosser v. Ross, 70 F.3d 1005, 1008 (8th Cir. 1995) (citing Wilson v. Westinghouse Electric Corp., 838 F.2d 286, 289 (8th Cir. 1988) (citing Camfield Tires, Inc., v. Michelin Tire Corp., 719 F.2d 1361, 1365-66 (8th Cir. 1983) ("A party should not be allowed to create issues of credibility by contradicting his own earlier testimony.")).  The court must be "mindful of [its] obligation to credit all of the evidence that favors the nonmovant, . . . but [the court is] not aware of any duty on [its] part to prune a witness's testimony so as to create a triable issue when the witness flatly contradicts himself in other parts of his testimony."  Prosser, 70 F.3d at 1009 (referencing Liberty Lobby, 477 U.S. at 255).  Mr. Yellow Robe is bound by his own testimony that there was no nexus between his meeting with Mayor Shaw and his termination from the Police Department.  No other evidence exists to make that connection.

Defendants' motion for summary judgment on the retaliatory termination claims of Counts II and IV is granted.

## ORDER

Based on the above analysis, it is hereby

ORDERED that defendants' motion for summary judgment (Docket 66) is

granted and plaintiff's claims are dismissed with prejudice.

Dated March 4, 2012.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE